ACCEPTED
03-14-00661-CV
4248396
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 2:11:58 PM
JEFFREY D. KYLE
CLERK

# Cause No. 03-14-00661-CV

In the Court of Appeals
for the Third Judicial District Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 2:11:58 PM
JEFFREY D. KYLE
Clerk

DEVVY KIDD, ET AL.,

APPELLANTS,

V.

PUBLIC UTILITY COMMISSION OF TEXAS,

APPELLEE.

On appeal from the 419th District Court; Travis County, Texas
Cause No. D-1-GN-12-003059

# BRIEF OF APPELLEE
# PUBLIC UTILITY COMMISSION OF TEXAS

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

JON NIERMANN
Chief, Environmental Protection
Division

KELLIE E. BILLINGS-RAY
Assistant Attorney General
State Bar No. 24042447
kellie.billings-ray@texasattorneygeneral.gov

ELIZABETH R. B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

DANIEL C. WISEMAN
Assistant Attorney General
State Bar No. 24042178
daniel.wiseman@texasattorneygeneral.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
(512) 463-2012
(512) 457-4639 (fax)

February 23, 2015                    **Oral Argument Conditionally Requested**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), Appellee the Public Utility Commission of Texas provides the following correction to the Identity of Parties and Counsel provided by the Appellant:

| Parties | Counsel |
|---------|---------|
| Public Utility Commission of Texas, <br><br>  Appellee | KELLIE E. BILLINGS-RAY<br>Assistant Attorney General<br>State Bar No: 24042447<br>kellie.billings-ray@texasattorneygeneral.gov<br><br>ELIZABETH R. B. STERLING<br>Assistant Attorney General<br>State Bar No:  19171100<br>elizabeth.sterling@texasattorneygeneral.gov<br><br>DANIEL C. WISEMAN<br>Assistant Attorney General<br>State Bar No. 24042178<br>daniel.wiseman@texasattorneygeneral.gov<br><br>Office of the Attorney General<br>P.O. Box 12548, MC-066<br>Austin, Texas 78711-2548<br>(512) 463-2012<br>(512) 457-4638 (fax) |

# TABLE OF CONTENTS

                                                                    PAGE

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . 2

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Issue 1.**     Is the Commission's denial of the Kidd Group's petition
               for rulemaking subject to judicial review?. . . . . . . . . . . . . . . . . 3

**Issue2.**      Is the Commission's denial of the Kidd Group's hearing
               request subject to judicial review in the absence of an
               adopted rule?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**A.**     **The Kidd Group asked the Commission to adopt a rule about smart
           meters.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**B.**     **The Commission denied the request because it already had an on-
           going rulemaking about smart meters.**. . . . . . . . . . . . . . . . . . 4

**C.**     **The Kidd Group participated in the other smart meter rulemaking.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    Petitions for Rulemaking Generally. . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   There is no right to judicial review for the denial of a petition for rulemaking.  (Responds to Kidd Group's Point of Error 1). . . . . . . 11

      1.     The Commission has sovereign immunity. . . . . . . . . . . . . . . 11

      2.     The Kidd Group has shown no waiver of sovereign immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   The denial of a hearing request is not subject to judicial review unless it is made in a rulemaking proceeding in which a rule is adopted. (Responds to the Kidd Group's Point of Error 2). . . . . . . . . . . . . . 15

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

APPENDICES

      APPENDIX A     ORDER GRANTING DEFENDANT'S PLEA TO THE JURISDICTION

      APPENDIX B     PETITION FOR INITIATION OF RULEMAKING PROCEEDINGS

      APPENDIX C     ORDER DENYING PETITION FOR RULEMAKING

# INDEX OF AUTHORITIES

**CASES**                                                                                      **PAGE**

*City of Amarillo v. Hancock,*
     239 S.W.2d 788 (Tex. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*City of Galveston v. State,*
     217 S.W.3d 466 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

*Coastal Habitat Alliance v. Pub. Util. Comm'n,*
     294 S.W.3d 276 (Tex. App.—Austin 2009, no pet.). . . . . . . . . . . . .  11*,* 16

*McMaster v. Pub. Util. Comm'n,*
     No. 03-11-00571-CV, 2012 WL 3793257 (Tex. App.—Austin Aug. 31, 2012,
     no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Sw. Bell Tel. Co. v. Pub. Util. Comm'n,*
     735 S.W.2d 663 (Tex. App.—Austin 1987, no writ). . . . . . . . . . . . .  13, 14

*Texas Comm'n on Envtl. Quality v. Bonser-Lain,*
     438 S.W.3d 887 (Tex. App.—Austin 2014, no pet.). . . . 2, 7, 8, 12, *passim*

*Texas Dep't of Crim. Justice v. Miller,*
     51 S.W.3d 583 (Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Texas Dep't of Parks & Wildlife v. Miranda,*
     133 S.W.3d 217 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 11

*Texas Parks & Wildlife Dep't v. Wilson,*
     991 S.W.2d 93 (Tex. App.—Austin 1999, pet. denied). . . . . . . . . . . . .  11

*Tooke v. City of Mexia,*
     197 S.W.3d 325 (Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

**CASES (CONT'D)**                                                                        **PAGE**

*Wichita Falls State Hosp. v. Taylor,*
      106 S.W.3d 692 (Tex. 2003)............................................... 8


**STATUTES**

TEX. GOV'T. CODE
      § 311.034.............................................. 12, 16
      § 2001.021.......................................... 9, 16, 18
      § 2001.021(b)............................................ 9
      § 2001.021(c)............................................ 9
      § 2001.029......................................... 10, 16, 17
      § 2001.029(b)........................................... 17
      § 2001.035...................................... 7, 12, 15, 17
      § 2001.035(a).......................................... 17
      § 2001.038............................................. 17
      § 2001.040........................................... 17, 18
      § 2001.176.............................................. 7
      §§ 2001.001-2001.902.................................. 7, 9


TEX. INS. CODE
      § 541.405............................................ 14, 15


TEX. UTIL. CODE
      § 15.001.............................................. 13
      §§ 11.001-66.017...................................... 13


TEX. WATER CODE
      § 5.351(a)............................................ 14


**RULES**

16 TEX. ADMIN. CODE
      § 22.281(a)(2).......................................... 10
      § 22.281(a)(3).......................................... 10

**RULES (CONT'D)**                                           **PAGE**

§ 22.282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 22.282(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**OTHER REFERENCES**

*Petition for Initiation of Rulemaking Proceedings Regarding Smart Meters,* Project No. 40404 (July 13, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-Out Program,* Project No. 40190 (February 16. 2012). . . . . . . . . . . . . . . . . . . . . . . . 5, 6

PUC Public Forum on Advanced Metering, Hearings before the Pub. Util. Comm'n, Capitol Events Archive (August 21. 2012). . . . . . . . . . . . . . . . . . . . . . 6

TO THE HONORABLE COURT OF APPEALS:

The Public Utility Commission of Texas (the Commission) files this brief in response to the Brief of Appellants, Devvy Kidd, et al. (the Kidd Group).

<u>STATEMENT OF THE CASE</u>

This is an appeal of the granting of the Commission's plea to the jurisdiction. The Commission denied the Kidd Group's petition for rulemaking in Project No. 40404 in which the Kidd Group requested a moratorium to be placed on the continued installation of smart meters by electrical utilities under their Advanced Metering System program.[1] The Commission declined to initiate a rulemaking under Project No. 40404 because it had already initiated a separate rulemaking under another project number.[2]

The Kidd Group filed suit, and the Commission filed a plea to the jurisdiction. After a hearing, the district court granted the plea to the jurisdiction, the Honorable Darlene Byrne presiding. This appeal followed.

---

[1] Pub. Util. Comm'n of Tex., *Petition for Initiation of Rulemaking Proceedings Regarding Smart Meters*, Project No. 40404 (July 13, 2012) (Order Denying Petition for Rulemaking at 6-7) (Order Denying Petition), *available at* http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=40404&TXT_ITEM_NO=131.

[2] *Id.* at 6-7.

## STATEMENT REGARDING ORAL ARGUMENT

The Commission does not believe oral argument is necessary in this case as the issues are squarely addressed by previous case law from this Court. *Texas Comm'n on Envtl. Quality v. Bonser-Lain*, 438 S.W.3d 887 (Tex. App.—Austin 2014, no pet.). If, however, this Court determines argument is necessary, the Commission requests to be heard.

## ISSUES PRESENTED

**Issue 1:** Is the Commission's denial of the Kidd Group's petition for rulemaking subject to judicial review?

**Issue 2:** Is the Commission's denial of the Kidd Group's hearing request subject to judicial review in the absence of an adopted rule?

STATEMENT OF FACTS

A.     The Kidd Group asked the Commission to adopt a rule about smart meters.

In May 2012, Devvy Kidd, John Kidd, and 193 other signatories filed a petition requesting the initiation of a rulemaking project, both emergency and ordinary, with the Commission.  They asked the Commission to initiate and conduct rulemaking procedures relating to the deployment of smart meters by electric utilities and others.[3]  The Kidd Group also asked for a public hearing where they could present evidence and testimony that concerned the effects of smart meters and to discuss the need to ban or closely regulate their use.[4]  The Commission designated the petition as Project 40404, published notice of this petition in the *Texas Register*, and set a deadline for comments.

B.     The Commission denied the request because it already had an on-going rulemaking about smart meters.

After receiving comments, the Commission issued its order in July 2012, denying the petitions for rulemaking. The written order summarized the comments

---

[3]  Order Denying Petition at 1.

[4]  *Id.*

it had received and the Commission's reason for denying the petition. The Commission's order explained it denied the petition because it had another project, Project No. 40190,[5] that had already been opened to address concerns about smart meters, and the Commission determined it would be more efficient and effective to consider concerns related to smart meters in one docket.[6]

## C. The Kidd Group participated in the other smart meter rulemaking.

When the Commission had a public hearing on Project No. 40190 in August 2012 at the Texas Capitol, several members of the Kidd Group gave public

---

[5] Pub. Util. Comm'n of Tex., *PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-Out Program*, Project No. 40190 (Feb. 16, 2012), *available at* http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings /pgControl.asp?TXT_UTILITY_TYPE=A&TXT_CNTRL_NO=40190&TXT_ITE M_MATCH=1&TXT_ITEM_NO=&TXT_N_UTILITY=&TXT_N_FILE_PART Y=&TXT_DOC_TYPE=ALL&TXT_D_FROM=&TXT_D_TO=&TXT_NEW=true.

[6] "After considering the petition and comments received, the Commission denies the Petition for Initiation of Rulemaking Proceedings, because the Commission has another project to address Petitioners' concerns about smart meters, Project No. 40190, *PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-Out Program*. In that project, the Commission has received extensive comments that raise concerns like those in the petition in this project. It will be more efficient and effective for the Commission to consider smart meter concerns in one project. As to the request for an emergency rule, the Commission denies that request for the additional reason that no emergency exists as to the issues raised in the petition. Therefore, consistent with Commission practice, the Commission denies the petition in this project, which will allow it to focus its consideration of concerns about smart meters to Project No. 40190." Order Denying the Petition at 6-7.

comment.[7] In addition, many members of the Kidd Group filed written comments

in that docket that discussed their concerns as to smart meters.[8]

---

[7] PUC Public Forum on Advanced Metering: Hearings before the Pub. Util. Comm'n, Capitol Events Archive (Aug. 21, 2012)(statement from Thelma Taormina at 30:49) (statement from Devvy Kidd at 47:22), *available at* http://www.house.state.tx.us/video-audio/capitol-events/.

[8] Tex. Pub. Util. Comm'n, *PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-Out Program*, Project No. 40190 (Item 511-Comment M.J. Shadden; Item 59-Comment John Cole, PhD; Item 590-Comment Tracy Stephens; Item 418-Comment Patricia Stroyick; Item 443-Comment Elizabeth Theiss; Item 128-Comment David and Patti Allen; Item 281-Comment Cindy Carriger; Item 98-Comment Beth Biesel; Items 17 and 18-Comment Joyce Kelley; Item 677-Comment Michael Denholm; Item 79-Comment Mark Atkins; Item 410-Comment Robert Paul; Items 595, 596, 597, 598 and 602-Comments Thelma Taormina; Item 69-Comment Judy Chambers; Item 458-Comment Dolores Bolock; Item 459-Comment Bruce Bolock; Item 455-Comment Twyla Parsons; Item 161-Comment Amanda M. Voelkel; Item 496- Comment Stanley Reynolds; Item 195-Comment Katrina Evenhouse; Item 194-Comment Randall Evenhouse; Item 477-Comment Joseph Ignazio; Items 478 and 601-Comments Gina Gentile; Item 460-Comment John Tyson; Item 505-Comment Alfreda Ballard; Item 77-Comment James Benge; Item 469-Comment Linda Rund; Item 461-Comment Frank Harriss; Item 514-Comment Lysbeth Warneke; Item 507-Comment Ralph Shawver; Item 72-Comment Brian Dansby; Item 13-Comment David Bond; Item 627-Comment John Buffa; Item 254-Comment Jeff and Melissa Gochnour; Item 484-Comment Donald Anderson; Item 403-Comment Carol Dean; Item 166-Comment Michelle and Terry Guy; Item 487-Comment Evelyn and Abel Montalvo; Item 90-Comment Gay and Dave Armstrong; Item 162- Comment Diane and John Wilson; Item 486-Comment Lawrence Worley; Item 89-Comment Lawrence and Beatriz Worley; Item 58-Comment Eva Finegan; Item 19-Comment Patti Glass; Item 59-Comment Dagne Florine, PhD; Item 423-Comment John Tweedell; Item 97-Comment Ricky Pearson; Item 515-Comment Hoi Heldt; Item 31-Comment Kathleen Grimes; Item 151-Comment Kathleen and Brian Grimes; Items 669 and 169-Comment Mary Stayton; Item 57-Comment Gaye and Billy Haehnel; and Item 456-Comment Gemi Powell), *available at* http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch.asp.

The Kidd Group filed a motion for rehearing in Project No. 40404, on which the Commission took no action. The Kidd Group filed suit in Travis County district court seeking judicial review of the Commission's denial of the petition for rulemaking and request for an evidentiary hearing and cited Texas Government Code, Section 2001.176 and Section 2001.035 as the jurisdictional basis for their appeal. The Commission filed a plea to the jurisdiction, and the district court granted the Commission's plea with prejudice.

## SUMMARY OF THE ARGUMENT

The Commission's sovereign immunity bars lawsuits against it by appeal or otherwise unless the Legislature has provided a clear and express waiver of immunity. As demonstrated both by the clear language of the statute and this Court's decision in *Texas Commission on Environmental Quality v. Bonser-Lain*, the statute that the Kidd Group cites, Texas Government Code, Section 2001.035, does not provide a basis for judicial review of an agency's decision not to adopt a rule. 438 S.W.3d 887 (Tex. App.—Austin 2014, no pet.). This provision of the Administrative Procedure Act[9] applies only to rules that have been adopted—not to the denial of a petition for rulemaking.

---

[9] Tex. Gov't Code §§ 2001.001-2001.902.

Sovereign immunity also bars a lawsuit about the Commission's refusal to grant a public hearing in a rulemaking it declined to conduct. The Administrative Procedure Act cannot reasonably be read to permit judicial review of an interim decision within a petition for rulemaking proceeding where the plain language of the statute—as this Court has previously determined—does not provide for judicial review of a denial of the petition for rulemaking itself. *Bonser-Lain*, 438 S.W.3d at 895.

Because the Legislature has not waived the Commission's immunity for this suit, nor has the Kidd Group pointed to any valid waiver of immunity, the district court properly dismissed the case for a lack of subject-matter jurisdiction.

## ARGUMENT AND AUTHORITIES

### I.   Standard of Review

Subject-matter jurisdiction presents a question of law that appellate courts review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Challenges to the subject-matter jurisdiction of a court may be raised by a plea to the jurisdiction. *Id.* at 225-26. Any ambiguity about the laws waiving sovereign immunity must be resolved in favor of immunity. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003).

The Texas Supreme Court has cautioned courts that are considering the scope of their authority to review an agency's action to "carefully restrict their jurisdiction to that clearly granted or necessarily implied from the Constitution and specific acts of the legislature." *City of Amarillo v. Hancock*, 239 S.W.2d 788, 791 (Tex. 1951).

## II.   Petitions for Rulemaking Generally

The Administrative Procedure Act[10] allows interested persons to file petitions for rulemaking with agencies, like the Commission, that have been delegated rulemaking authority by the Legislature. Tex. Gov't Code § 2001.021. The agency is required to prescribe by rule the form for such petitions and the procedural rules for their submission, consideration, and disposition. *Id.* at § 2001.021(b). Upon the submission of a petition for rulemaking, the agency must within sixty days either deny the petition in writing, stating the reasons for the denial, or initiate a rulemaking. *Id.* at § 2001.021(c). If the agency chooses to initiate a rulemaking, the Administrative Procedure Act provides that "[b]efore adopting a rule," it must grant an opportunity for public hearing if it is requested by at least twenty-five people, a governmental entity, or an association with at least twenty-five members.

---

[10]  Tex. Gov't Code §§ 2001.001-2001.902.

*Id.* at § 2001.029.

The Commission's Rules that address its rulemaking procedures, which generally mirror the Administrative Procedure Act, are located at 16 Texas Administrative Code, Chapter 22, Subchapter O. They provide that upon receipt of a rulemaking petition, the Commission shall publish notice in the *Texas Register* and receive comments for twenty-one days following the notice. 16 Tex. Admin. Code § 22.281(a)(2) (2001) (Pub. Util. Comm'n of Tex., Procedural Rules). The rules, consistent with the Administrative Procedure Act, require the Commission to, within sixty days of receiving the petition, deny it in writing or initiate a rulemaking proceeding. *Id.* § 22.281(a)(3).

If the Commission decides to grant the petition and initiate a rulemaking proceeding, it does so by publishing notice of the proposed rule in the *Texas Register.* If submitted within sixty days of the proposed rule's publication, the Commission will grant requests for public hearing made by at least twenty-five people, governmental entities, or associations of at least twenty-five members.[11]

---

[11] That this hearing provision applies to actual rulemaking proceedings rather than petitions for rulemaking is apparent from the sixty day deadline. Petitions for rulemaking must be granted or denied within sixty days. In rulemaking proceedings, people have sixty days from publication to request a hearing.

**III.** **There is no right to judicial review for the denial of a petition for rulemaking. (Responds to the Kidd Group's Point of Error 1).**

**1.** **The Commission has sovereign immunity.**

The doctrine of sovereign immunity has been part of the jurisprudence of the State since its inception. The purpose of immunity is to protect the sovereign from voluminous litigation and to shield the public from the costs and consequences of improvident actions of their governments. *Tooke v. City of Mexia*, 197 S.W.3d 325, 331-32 (Tex. 2006).

The State of Texas and its agencies are protected by sovereign immunity, unless the Legislature has waived that immunity. *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007); *Texas Parks & Wildlife Dep't v. Wilson*, 991 S.W.2d 93, 95 (Tex. App. Austin—1999, pet. denied). Sovereign immunity deprives courts of subject-matter jurisdiction to hear cases against the State and its entities, and without a basis for jurisdiction, the suit must be dismissed. *Miranda*, 133 S.W.3d at 225-26; *Coastal Habitat Alliance v. Pub. Util. Comm'n*, 294 S.W.3d 276, 280-81 (Tex. App.—Austin 2009, no pet.). The party suing a governmental entity bears the burden of affirmatively demonstrating the trial court has jurisdiction to hear the dispute. *Texas Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 586-87 (Tex. 2001).

The Legislature has mandated that "a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." Tex. Gov't Code § 311.034; *City of Galveston*, 217 S.W.3d at 469; *Tooke*, 197 S.W.3d at 329, n. 2.

### 2.    The Kidd Group has shown no waiver of sovereign immunity.

The absence of a waiver of the Commission's sovereign immunity requires that the Kidd Group's case be dismissed for lack of jurisdiction. This Court's recent opinion in *Texas Commission on Environmental Quality v. Bonser-Lain* holds that denials of petitions for rulemaking are not subject to judicial review under the Administrative Procedure Act. *Bonser-Lain*, 438 S.W.3d at 894. Nor has the Legislature waived the Commission's immunity to claims concerning the denial of a hearing request unless the request was made in a rulemaking proceeding that results in the adoption of a rule. Because these jurisdictional defects cannot be cured, the district court properly dismissed the Kidd Group's suit, and this Court should affirm that judgment.

The Kidd Group argues that Section 2001.035 of the Administrative Procedure Act is the waiver of the Commission's sovereign immunity that confers jurisdiction upon the district court. However, this Court has previously held in

*Bonser-Lain* that "the [Administrative Procedure Act] does not provide a right to judicial review of an agency's refusal to adopt rules." *Id.* at 894. This Court noted that while the Administrative Procedure Act specifies procedures for submitting and acting upon petitions for rulemaking, it is silent regarding judicial review of decisions on petitions for rulemaking. *Id.* Based on this "deliberate silence," this Court concluded that denials of rulemaking petitions are not reviewable under the Administrative Procedure Act. *Id.*

Further, this jurisdictional defect cannot be cured by citing to another waiver of sovereign immunity. Although the Legislature has waived the Commission's immunity against certain claims in the Public Utility Regulatory Act (PURA),[12] this Court has held that, despite its seemingly broad language,[13] PURA, like the Administrative Procedure Act, does not allow for review of denials of petitions for rulemaking. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 735 S.W.2d 663, 665 (Tex. App.—Austin 1987, no writ).

In *Southwestern Bell Telephone Company v. Public Utility Commission,* the

---

[12] Tex. Util. Code §§ 11.001-66.017.

[13] Texas Utilities Code, Section 15.001 provides that "[a]ny party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule."

Commission— as it did here—denied a petition for rulemaking, stating in its order denying the petition that the relevant issues would best be addressed in a different agency proceeding. *Id.* at 666. This Court determined that PURA did not allow for judicial review under the circumstances presented, even though the statute was "so broad as to permit, facially at least, the judicial review of almost any order the Commission might enter . . . whether dealing with contested cases, rulemaking, investigations, or enforcement." *Id.* at 671. This Court decided that it was precluded from reviewing the Commission's decision because such review would require a court "to determine all the arguably relevant subsidiary matters that might be involved" and "would place in disarray the regulatory scheme established by the Legislature. . . ." *Id.* at 668.

The *Southwestern Bell* holding was confirmed by this Court in *Bonser-Lain*, which likewise found that even the broader language of the Texas Water Code[14] did not waive the agency's immunity for such a suit. *Bonser-Lain*, 438 S.W3d at 894. Further, the Legislature knows how to authorize judicial review of the denial of a petition to initiate a rulemaking proceeding when it desires to do so. *See, e.g.*, Tex.

---

[14] Texas Water Code, Section 5.351(a) provides that "[a] person affected by a ruling, order, decision, or other act of the commission" may file suit.

Ins. Code § 541.405.  It did not do so here.

**IV.   The denial of a hearing request is not subject to judicial review unless it is made in a rulemaking proceeding in which a rule is adopted. (Responds to the Kidd Group's Point of Error 2).**

Contrary to the Kidd Group's arguments, the language of Section 2001.035 is clear.  Section 2001.035 only allows a person to contest a rule an agency has actually adopted.[15]  Further, there is no requirement for the Commission to hold a hearing under 16 Texas Administrative Code Section 22.282(d) and Texas

---

[15]  Specifically, Section 2001.035 provides:

(a) A *rule* is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.

(b) A person must initiate a proceeding to contest a *rule* on the ground of noncompliance with the procedural requirements of Sections 2001.0225 through 2001.034 not later than the second anniversary of the effective date of the *rule*.

(c) A state agency substantially complies with the requirements of Section 2001.033 if the agency's reasoned justification demonstrates in a relatively clear and logical fashion that the *rule* is a reasonable means to a legitimate objective.

(d) A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a *rule*.

Tex. Gov't Code § 2001.035 (emphasis added).

Government Code Section 2001.029 where no rule has been adopted.

Because the Administrative Procedure Act—as *Bonser-Lain* makes clear—does not provide for judicial review of the denial of a rulemaking petition, it cannot be reasonably read to allow for judicial review of interim decisions within a petition for rulemaking proceeding. As with the denial of rulemaking petitions, the Administrative Procedure Act is "deliberately silent" as to the judicial review of denials of rulemaking hearing requests under Texas Government Code Section 2001.021 and only waives sovereign immunity where an agency actually adopts a rule. Waiver of immunity must be by clear and unambiguous language. Tex. Gov't Code § 311.034. The Legislature has not waived the Commission's immunity from suit in this instance.

Nor does PURA authorize review of the denial of a hearing request. In the absence of an appealable final order, neither the Administrative Procedure Act nor PURA provides for judicial review of interim orders. *See, e.g., McMaster v. Pub. Util. Comm'n*, No. 03-11-00571-CV, 2012 WL 3793257, at *4 (Tex. App.—Austin Aug. 31, 2012, no pet.) (mem. op.); *Coastal Habitat Alliance*, 294 S.W.3d at 279. Here where no rule was ultimately adopted, there is no right to review. And neither PURA nor the Administrative Procedure Act provide for the review of the interim

request for a hearing.

Further, the plain language of the statute itself shows that the requirement to have a hearing only attaches once a rulemaking is initiated. If no rulemaking is initiated, no hearing is required, regardless of the number of people who request it.

The Commission does not contend, as Appellants have argued, that judicial review of the denial of a hearing request under Administrative Procedure Act Section 2001.029(b) and Rule 22.282 is never available. As the plain language of those provisions make clear, such hearings are available in a rulemaking proceeding, and a hearing must be granted "before [the agency] adopts a substantive rule." Tex. Gov't Code § 2001.029(b). Thus, Section 2001.029 and Rule 22.282 are procedural requirements that affect the validity of the resulting rule. In Section 2001.038 of the Administrative Procedure Act, the Legislature has expressly waived the Commission's immunity from a challenge to the procedure followed by an agency in adopting a rule. Tex. Gov't Code § 2001.038.

Section 2001.035 provides that an adopted rule is voidable unless it is adopted "in substantial compliance with Sections 2001.0225 and 2001.034." Tex. Gov't Code § 2001.035(a). Non-compliance with the procedural requirements of Section 2001.029 can be a basis for judicially invalidating an adopted rule. *See* Tex.

Gov't Code § 2001.040 ("If a court finds that an agency has not substantially complied with one or more procedural requirements of Sections 2001.0225 through 2001.034, the court may remand the rule . . ."). Notably absent from the Administrative Procedure Act sections for which judicial review can be sought is Section 2001.021, the statutory provision under which the Kidd Group submitted their rulemaking request to the Commission.

Thus, while the Legislature has demonstrated its intent to allow review of the denial of a hearing request with respect to adopted rules, it has not done so when, as here, a rule was not actually adopted.

## PRAYER

For these reasons the Commission prays that the district court's dismissal of this suit for lack of subject-matter jurisdiction be affirmed in all things and that Appellants take nothing by their suit.

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division

/s/ *Kellie E. Billings-Ray*
KELLIE E. BILLINGS-RAY
Assistant Attorney General
State Bar No. 24042447
kellie.billings-ray@texasattorneygeneral.gov

ELIZABETH R. B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

DANIEL C. WISEMAN
Assistant Attorney General
State Bar No. 24042178
daniel.wiseman@texasattorneygeneral.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
(512) 457-4638 (fax)

## CERTIFICATE OF COMPLIANCE

I certify that the forgoing computer-generated document contains 3248 words, pursuant to Tex. R. App. P. 9.4(i)(3) relying on the word count feature of WordPerfect used to prepare the document.

*/s/ Kellie E. Billings-Ray*
Kellie E. Billings-Ray

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2015 a true and correct copy of the foregoing *Brief of Appellee Public Utility Commission of Texas* has been served on the following counsel electronically through an electronic filing manager or by email:

Mr. David Tuckfield
THE LAW OFFICE OF DAVID J. TUCKFIELD, PC
12400 West Highway 71, Suite 350-150
Austin, Texas 78738
512-576-2481
512- 366-9949 (Fax)
david@tuckfieldlaw.com

Mr. Roger B. Borgelt
BORGELT LAW
614 S. Capital of Texas Hwy.
Austin, Texas 78746
512-600-3467
roger@borgeltlaw.com

**Attorneys for Plaintiffs**

Mr. Jason M. Ryan
CenterPoint Energy Service Company LLC
1111 Louisiana Street
Houston, Texas 77002
713-207-7261
713-574-2261(Fax)
jason.ryan@centerpointenergy.com

Mr. Dale Wainwright
dale.wainwright@bgllp.com
Mr. W. Stephen Benesh
steve.benesh@bgllp.com
Mr. Davison W. Grant
davison.grant@bgllp.com
BRACEWELL & GIULIANI LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78707-4061
512-472-7800
800-404-3970 (Fax)

**Attorneys for CenterPoint Energy Houston Electric, LLC**

Ms. Jo Ann Biggs
Mr. Cortney C. Thomas
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
jbiggs@velaw.com
cthomas@velaw.com
214-220-7735
214-999-7735 (Fax)

**Attorneys for Oncor Electric Delivery Co.**

Mr. Patrick Cowlishaw
Ms. Stephanie C. Sparks
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
214-953-6000
214-953-5822 (Fax)
pcowlishaw@jw.com
ssparks@jw.com

Mr. Scott Seamster
Texas-New Mexico Power Company
225 E. John Carpenter Fwy, Suite 1500
Irving, Texas 75062
469-484-8577
469-484-8033 (Fax)
scott.seamster@pnmresources.com

**Attorneys for Texas-New Mexico Power Company**

Mr. Patrick Pearsall
DUGGINS WREN MANN & ROMERO
P.O. Box 1149
Austin, Texas 78767
ppearsall@dwmrlaw.com
512-744-9300
512-744-9399 (Fax)

Ms. Rhonda Colbert Ryan
American Electric Power Company
400 W. 15th Street, Ste. 1500
Austin, Texas 78701
rcryan@aep.com
512-481-3321
512-481-4587 (Fax)

**Attorneys for AEP Texas Central Company and AEP Texas North Company**

/s/ *Kellie E. Billings-Ray*
Kellie E. Billings-Ray

# APPENDIX A

Filed in The District
of Travis County, Texas

SEP 3 0 2014

At _____3:43_____ P.M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-12-003059

| | | |
|---|---|---|
| DEVVY KIDD, et al., | § | IN THE DISTRICT COURT OF |
|     Plaintiffs, | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| TEXAS PUBLIC UTILITY | § | |
| COMMISSION, | § | |
|     Defendant. | § | 419TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANT'S PLEA TO THE JURISDICTION

Came on for consideration the Plea to the Jurisdiction of Defendant, the Public Utility Commission of Texas. After considering the same and the relevant pleadings and briefing on file herein, the Court is of the opinion that Defendant's Plea should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's Plea to the Jurisdiction is GRANTED WITH PREJUDICE.

SIGNED on the 30 day of September, 2014.

DARLENE BYRNE
PRESIDING JUDGE

# APPENDIX B

# BEFORE THE
# PUBLIC UTILITIES COMMISSION OF TEXAS

## IN RE: DEVVY KIDD, JOHN KIDD ET AL.

### No. 40404

## PETITION FOR INITIATION OF RULEMAKING PROCEEDINGS

WE THE UNDERSIGNED, hereinafter "Petitioners", invoking our right to do so pursuant to Texas Administrative Code, Title 16, Part II, § 22.281, hereby respectfully, but urgently, petition the PUBLIC UTILITIES COMMISSION OF TEXAS, hereinafter "PUC", to initiate and conduct rulemaking procedures, both emergency and ordinary, pursuant to Subchapter O of Title 16, Part II, relative to the current and continuing deployment of so-called "Smart Meters" by electrical utilities and others as part of their "Advanced Metering Infrastructure" (AMI) program.

In support of the same petitioners respectfully show:

### FACTUAL BACKGROUND

1. Commencing on or about 2007 and continuing to date Texas electrical providers, including but not by way of limitation, Oncor, Centerpoint, Texas-New Mexico Power, AEP Texas Central and AEP Texas North, hereinafter "utilities", assisted and encouraged by others with a pecuniary interest in doing so, either as suppliers or installers of so-called "smart meters", hereinafter "purveyors", have engaged in a concerted and deliberate campaign to impose the installation, use and operation of so-called "Smart Meters" on electricity consumers in their homes and businesses, both against their expressed opposition and without their valid and free and voluntary informed consent.

1

2.     In order to persuade consumers to permit the installation of smart meters on their residences and businesses some and, perhaps, all, utilities and purveyors have engaged in egregious misconduct, engaging in deliberate fraudulent representations and fraudulently withholding vital information material to the consumer's informed consent, and where fraud was insufficient such utilities and purveyors have engaged in unlawful duress and even unlawful force. Examples of fraudulent misrepresentations, fraudulent concealment, duress and force include, but are not limited to:

a. **Fraudulently stating**, both verbally and in writing, that the installation of smart meters is mandatory by law, citing Texas HB 2129 as authority for such, all the while knowing that there is no law making the installation of smart meters mandatory;

b. **Implicating personnel of the PUC** in their fraudulent activities by persuading them to aid and abet in their fraudulent representations by fraudulently responding to complaints and inquiries by concerned citizens that "Customers do not have the opportunity to "opt out" of having their meter replaced with an AMS meter" even though the PUC official or representative could not pretend to be unaware of Texas Administrative Code, Title 16, Part II, § 25.130(d)(1), which clearly states that " Deployment and use of AMS by an electric utility is voluntary . . ."

c. **Fraudulently stating** that the installation of smart meters will reduce consumers' electric bills and conserve energy;

d. **Fraudulently withholding and concealing** from the consumer the fact that the smart meters, once installed and initiated, will emit dangerous levels of radiofrequency (RF) radiation and electromagnetic field (EMF) radiation into their residences and businesses;

e. **Fraudulently withholding and concealing** from the consumer the health risks associated with both short term and long term exposure to such RF and EMF radiations, particularly with respect to children and medically compromised and sensitive persons and the likelihood that such emanations will interfere with medical equipment and devices such as pacemakers and insulin injectors;

f. **Fraudulently contending** that utility easements entitle them to come onto the consumer's premises at reasonable times and in a reasonable manner to install and maintain their equipment knowing all the while that the installation of smart meters also includes the permeation of the *interior* their residences and businesses with RF and EMF radiation at all hours of day and night, grossly exceeding the limitations of any utility easement, both

2

with respect to the access to their *exterior* equipment and with respect to intrusions at reasonable times and in a reasonable manner;[1]

g. **Imposition of unlawful duress** in the form of threats to discontinue electrical service to consumers unless they permit installation of the smart meter;

h. **Imposition of unlawful duress** by actually interrupting service to consumers and refusing to restore service unless they permit installation of the smart meter; and

i. **Imposition of unlawful force** in the form of installing the smart meter over the stated objection of the consumer.[2]

3.    Accordingly, every smart meter installation performed to date and those being currently performed have been and are upon the basis of fraud, deceit, concealment, undue duress and unlawful force, rendering any consent thereto or acquiescence therein null and void.

4.    As will more fully appear from the authorities referred to hereinbelow and made a part hereof by reference, the dangers and risks to public health and wellbeing in general associated with the radio frequency radiations (RF) and electromagnetic field radiations (EMF) generated by smart meters are well established in the global scientific community and the level of such radiations emitted by a single smart meter are sufficient to cause heart irregularities, headaches, insomnia, hypertension, dizziness and nausea in people who are in good health.

5.    Petitioners who have been subjected to forced or compelled installation of smart meters or have been exposed to RF and EMF radiation generated by smart meters fraudulently installed on neighboring homes and businesses have experienced difficulties with symptoms of insomnia, headaches, dizziness, nausea and other symptoms. Petitioners further report that the

---

[1] Utilities have also somehow persuaded personnel of the PUC to become complicit in this fraudulent representation, as well, causing them to state the same to complaining and inquiring consumers, both utilities and the PUC official knowing that such utility easements do not pertain to intrusions into consumers' homes at all hours of day and night.

[2] In one recent occasion an installer ignored the protestations of a consumer and stated his intention to install the smart meter in spite of her refusal. The only thing that prevented the forced installation was the consumer's exertion of greater force in the form of a firearm. Consumers should not have to resort to the use of arms to protect themselves from forced participation in a voluntary implementation program. Appropriate rules and regulations ensuring that the rights and safety of consumers are protected by the PUC render self-protection, and the means of such, unnecessary. In this incident, however, the only rule governing the situation was the rule of greater force.

3

installation and operation of smart meters, whether on their own homes or in direct proximity to their homes has caused pets to behave strangely and in some cases to demonstrate severe distress.

6.     Those consumers and residents of served homes who are medically compromised or sensitive, however, are not only subjected to additional risk and peril of their health directly. RF and EMF radiations such as those emitted by Smart meters have been demonstrated to have interfered with life-sustaining medical equipment, such as pacemakers and insulin injectors, yet no rules thus far adopted make any provision for the protection of such medically sensitive persons from involuntary exposure to the smart meters' RF and EMF radiations.

7.     Scientific research, as demonstrated by a number of the exhibits attached hereto, indicates there is strong evidence that long term effects of repeated exposure to RF and EMF radiation may cause cancer, particularly in children and elderly, and can interfere with and alter DNA structure and function.  The EPA, President's Council on Cancer, have indicated that the potential for harm to public health caused by RF and EMF radiation is significant and that the exposure of the public to such radiation should be limited where possible until further studies determine whether and, if so, how equipment and devices that emit RF and EMF radiation can be safely employed.

8.     The RF and EMF radiation emitted by a singular smart meter alone (2.4 GHz) are at a level that has been established as cause for concern, but that initial level of RF and EMF radiation is only part of the story, since in the implementation and operation of the AMI radiations also are emitted by adjunct components of the system, such as repeaters, nodes, antennae, including those of neighboring units receiving and responding between meters, and emissions from radio towers and other receivers and transmission sources and components,

4

grossly magnify the 5,000 to 6,000 daily transmissions of RF and EMF radiation generated by the typical smart meter alone.

9. Smart meters have also been known to short out, causing fires, while at the same time interfering with the functioning of fire detection and fire extinguishing systems, and are believed to render the general electric grid unstable.

10. As reported to the PUC by Texas State Rep. Barbara Mallory Caraway, State Sen. Tony Fraser and State Rep. Robert Miklos, the reliability of smart meters' measurement and/or reporting of electricity usage is in serious doubt due to the sudden unexplained increase in billings experienced by those consumers where the smart meter has been installed, for which those three legislators have all called upon the PUC to issue an immediate moratorium on the continued installation of smart meters, halting further installations until further study can verify whether the meters are even functioning accurately as meters.

11. Still another adverse consideration to the implementation of the AMI is the exposure of private information to others, the exposure to invasions of privacy. Scientists and hackers have demonstrated that the data transmitted by smart meters can be intercepted without the necessity of sophisticated equipment, one such hacker having demonstrated how he could, and did, with a $30 device readily available in the marketplace, intercept data on households at will.

12. Data pirates have been known to intercept and mine data from the smart meters' transmissions and to market that data, all at the expense of the consumer's privacy. Criminals could, as well, use intercepted or hacked smart meter data to determine when consumers are at home or away from home, the consumers unwittingly broadcasting to burglars and thieves when the "coast is clear".

5

13. Those states that have conducted an objective analysis of the economy of implementation, i.e., the cost versus any benefit, such as Maine, New Jersey, Maryland and Hawaii have all decided to prohibit AMI implementation in their states due to the fact that the meters do not reduce costs, do not conserve any energy, and that any utility company reduction in expense by termination of meter readers constitutes a small fraction of the cost of the meters and their installation, not to mention the costs of the meters to the consumer in terms of health and safety risk, loss of privacy and exposure to criminal activity.

14. In addition, any savings in the form of firing meter readers does not actually benefit the community in that the burden of support for those meter readers is not eliminated, but rather shifted to the State via unemployment benefits and re-employment services and to the consumer via reduction in economic support previously provided by a gainfully employed meter reader.

15. Accordingly, hasty and precipitous installation of smart meters, without consideration given to general health risks being imposed on the unaware and forced on the aware, without consideration of the effects of RF and EMF radiation on medical devices and on the general population or medically sensitive persons and medical equipment and devices, without provision for their "opting out" of the use of smart meters and without rules requiring utilities and purveyors to properly and honestly inform the consumer of the risks associated with the use of such devices, is imprudent and ill advised and contrary to the public good.

6

16. In 2005 the Texas Legislature enacted HB 2129, which "encouraged", but did not require, the implementation of the Advanced Metering Infrastructure (AMI), i.e., deployment of smart meters in Texas. Nothing in that bill or any other law enacted by the legislature requires any consumer to permit the installation of such meters nor did any part of that act permit utilities and purveyors to require installation of smart meters as a condition for continued electrical service or to represent them as mandated by law. Texas utilities and purveyors have, nevertheless, fraudulently cited HB 2129 as requiring Texas consumers to permit the installation of smart meters on their homes and businesses.

17. The PUC has adopted and published substantive rules regarding the interruption of electric service to consumers, specifically, Texas Administrative Code, Title 16, Part II, § 25.29, yet that rule does not authorize utilities to discontinue electric service due to a consumer's refusal to permit the installation of a smart meter on his home or business.

18. The PUC rules regarding discontinuance or interruption of service (§ 25.29) also make special provisions in order to protect the ill and infirm from adverse effects of discontinuance, yet no equivalent recognition and protection of ill and infirm, particularly those dependent on life-sustaining medical devices such as pacemakers and insulin injectors, is provided regarding the implementation of the AMI.

19. The PUC has also adopted substantive rules regarding the implementation of the AMI and its advanced metering systems, but those rules specifically provide that implementation is voluntary. Texas Administrative Code, Title 16, Part II, § 25.130(d)(1) leaves no room for the utilities or purveyors to justify their fraudulent misrepresentations to the public that installation of "smart" meters is required by law:

7

**Subchapter F. Metering**
**§ 25.130 Advanced Metering**
**(d) Deployment and use of advanced meters**
(1) Deployment and use of AMS by an electric utility is voluntary unless otherwise ordered by the commission. . . .

20.     No legislation nor any regulatory rule makes the installation of smart meters mandatory for consumers nor does any legislation or regulatory rule, whether state or federal, authorize the use of fraud, duress or force for the implementation of the AMI, yet utilities and purveyors routinely engage in all such misconduct in their effort to impose their RF and EMF radiating devices on consumers' homes and businesses.

## LEGAL IMPLICATIONS

21.     The injury and potential injury by the expedited and precipitous installation of smart meters without taking into account the deleterious effect on the public health and safety in general and without making provision for protection of medically sensitive persons, such as children and the elderly, as well as those reliant on life-sustaining medical devices is enormous.

22.     That injury and illness, both immediately inflicted and gradually inflicted by the smart meters' RF and EMF radiations is being imposed daily and such harm is irreparable.

23.     In addition, the harm is likely to increase as the period of repeated and constant excessive exposure of the public, particularly its children, elderly and infirm, and the continued addition of new meters to the infrastructure is increasing that risk and public injury on a daily basis.

24.     The use of blatant misconduct by utilities and purveyors in the form of fraudulent misrepresentations, fraudulent concealment, unlawful duress and even force is a near perfect foundation for the largest collective lawsuit in the history of the nation because it will include a class of persons consisting not just of tobacco users or those exposed to asbestos, but to every

8

man, woman and child in the nation, making tobacco and asbestos class actions and litigation look like petty suits in small claims court.

25. The imprudence of prematurely introducing products or conditions without first fully understanding the consequences cannot be better illustrated than the rush in the latter '50's and early '60's to share the benefits of the new "wonder drug", thalidomide, which was lauded as an effective tranquilizer and painkiller, and was proclaimed a sure cure for insomnia, coughs, colds and headaches. Nine months later the costs of such haste were apparent in the form of thousands of babies being born with every manner of grotesque and heartbreaking defects. *The current rushed and forced introduction of smart meters without fully understanding the consequences is indistinguishable from the injection of thalidomide into the public water supply to reduce the number of headaches in the general population.*

26. Thus, from a legal standpoint, the continued forced and fraudulently induced implementation of the AMI and the aggregate effect of more and more meters magnifying and increasing the daily dosage of RF and EMF radiation administered to the public is an unavoidable legal "perfect storm" that will roll back over the utilities and purveyors, likely causing their financial failure and a commensurate implosion of the electrical distribution infrastructure.

27. The only way such a self-destructive development can be avoided is by the cessation of further installations until the risks and perils of can be determined, examined and weighed against the benefits, if any, of the AMI smart meters and, once safe levels of emissions are determined, rules promulgated and adopted to ensure the deployment of such metering equipment is done, if at all, in a manner that will protect and preserve the health and wellbeing of the public.

## AUTHORITIES AND PUBLICATIONS IN SUPPORT OF THIS PETITION

28.     Petitioners show that a large body of evidence and scientific authority has been assembled verifying the concerns and the dangers inherent in the unguarded deployment of so-called smart meters, including, but not by way of limitation, the following:

- **American Academy of Environmental Medicine; Decision Proposed Decision of Commissioner Peevy (Mailed 11/22/2011) - BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA - On the proposed decision 11-03-014;** Excerpt: "The Board of the American Academy of Environmental Medicine opposes the installation of wireless "smart meters" in homes and schools based on a scientific assessment of the current medical literature (references available on request). Chronic exposure to wireless radiofrequency radiation is a preventable environmental hazard that is sufficiently well documented to warrant immediate preventative public health action."

- **State of Connecticut - Office of the Attorney General George Jepsen - Press Release - Feb 8, 2011;** Excerpt:  Connecticut Light & Power Co.'s plan to replace existing electric meters with advanced technology would be very expensive and would not save enough electricity for its 1.2 million customers to justify the expense, Jepsen said. Jepsen made the comments in a brief filed Tuesday with the state Department of Public Utility Control, which is reviewing CL&P's request to replace all existing meters with "advanced meter infrastructure.

  To evaluate the technical capabilities and reliability of the advanced metering system, state regulators previously approved a limited study of 10,000 meters. Between June 1 and Aug. 31, 2009, CL&P tested the meters on 1,251 residential and 1,186 small commercial and industrial customers, who volunteered and were paid for their participation in the study. The company reported its results to the DPUC on Feb. 25, 2010.

  "The pilot results showed no beneficial impact on total energy usage," Jepsen said. "And, the savings that were seen in the pilot were limited to certain types of customers and would be far outweighed by the cost of installing the new meter systems," he said.

- **Dr. Magda Havas, B.Sc., Ph.D – October 12, 2010. California Council on Science and Technology (CCST): Request for input regarding Smart Meters;** Excerpt: "An additional point I would like to make relates to dirty electricity. Wires can act like antennas and the radiation produced by radio frequency generating devices can flow along and reradiate from wires both inside and outside the home. This contributes to dirty electricity and localized radiation exposure. Dirty electricity has been associated with

10

cancers; health and behavior problems in schools; and both diabetes and multiple sclerosis."

- **Olle Johansson, Assoc. Professor, Karolinska Institute, Dept of Neuroscience, July 9, 2011 to the California Public Utilities Commission**; Excerpt: "The recent determination of the World Health Organization (WHO) to include radiofrequent radiation on the 2B list of carcinogens also applies to devices such as smart meters. Already September 4, 2008, the European Parliament voted 522 to 16 to recommend tighter safety standards for cell phones (Europ. Parl. resolution on the mid-term review of the European Environment and Health Action Plan 2004-2010). In light of the growing body of scientific evidence implicating cell phone use with brain tumors, the Parliament said, "The limits on exposure to electromagnetic fields [EMFs] which have been set for the general public are obsolete.""

- **Olle Johansson, Assoc. Professor, Karolinska Institute, Dept of Neuroscience, January 17, 2012 to The California Council on Science and Technology**; "It is becoming more and more obvious that the exposure to electromagnetic fields not only may induce acute thermal effects to living organisms, but also non-thermal effects, the latter often after longer exposures. This has been demonstrated in a very large number of studies and includes cellular DNA-damage, disruptions and alterations of cellular functions like increases in intracellular stimulatory pathways and calcium handling, disruption of tissue structures like the blood-brain barrier, impact on vessel and immune functions, and loss of fertility.

  "Many smart meters are close to beds, kitchens, playrooms, and similar locations. These wireless systems are never off, and the exposure is not voluntary. The smart meters are being forced on citizens everywhere. Based on this, the inauguration of smart meters with grudging and involuntary exposure of millions to billions of human beings to pulsed microwave radiation should immediately be prohibited until 'the red flag' can be hauled down once and for all.""

- **Olle Johansson, Assoc. Professor, Karolinska Institute, Dept of Neuroscience – Press Release; Scientists Urge Halt of Wireless Rollout and Call for New Safety Standards.** "The combined effect of cell phones, cordless phones, cell towers, WI-FI and wireless internet place billions of people around the world at risk for cancer, neurological disease and reproductive and developmental impairments."

- **Radio Frequency Radiation: The Invisible Hazards of "Smart" Meters by Dr. Ilya Sandra Perlingieri – August 2011** "Health Problems and Damage. Many experts are speaking out of the dangers of RF/EMF exposure. Medical journals and scientific reports show that there is DNA damage, cell mutation, degenerative diseases, and damage to vision and clear-thinking (short-term memory and speech are affected). "The protective Blood Brain Barrier has been breached; and there are numerous studies that show that "exposure to low levels pulsed or continuous microwave radiation has been reported to affect neurotransmitter metabolism..." while other studies suggest that "RF radiation can alter the electrical activity of the brain" and changes cognitive function and behavior.

11

Although there has been very little reported in mainstream media, there is extensive information available information on the Internet.

"Health problems, due to constant exposure of RF radiation, already reported include: migraines, nausea, vomiting, vision impairment, ringing in the ears (tinnitus), muscle spasms and nerve pain, heart palpitations, chest pain, and sleeplessness caused by intense bursts (pulsing) of radiofrequency.

"Other physical problems relate to people who have metal in their bodies: dental metals (such as silver-mercury amalgams or gold inlays); or wear metal jewelry or metal eyeglasses (the metal intensifies the RF). People with pacemakers, prosthetic devices, and wireless insulin pumps have had medical problems due to RF interference. This is an unsafe technology, where we all are experimental lab subjects being used for dangerous levels of invisible but constant RF/EMF exposure. There is already an enormous public health threat to all of us."

- **Invisible Hazards in the Wireless Age – Dr. George Carlo**; "..over the past 15 years, the issue has evolved from a scientific determination of whether or not there are health problems caused by wireless technology to the realization that we have an emerging medical crisis for people who are electro-hypersensitive. We have a potential link to autism and other serious health effects. *Many of us believe that the threat posed by wireless technology is the most serious we will face in our lifetime*. The top priority for us now is to address those medical concerns." (emphasis added)

- **Elihu D. Richter MD, MPH (Assoc Professor), Hebrew University-Hadassah, School of Public Health and Community Medicine, Unit of Occupations and Environmental Medicine to Susan Hackwood, Ph.D., Executive Director, California Council on Science and Technology. Letter of Comment on Smart Meter Report** "The risks we are assessing today from exposure to RFMW and dirty electricity from Smart Meters placed everywhere recalls the story of population-wide exposure to lead in gasoline. We now know, in retrospect, that the entire urban population, notably children, were receiving exposures which were impairing their IQ, emotional well being, and long term growth and development. These findings led to the elimination of lead from gasoline. In retrospect, we were not heeding the early warnings regarding an impending population-wide hazard with disastrous effects. I suggest that in the case of population-wide exposure to RF, the situation is similar, with one exception: The warnings may no longer be early. *"I warn that we may be on the cusp of a similar scenario here with regard to community wide exposures to RF/MW and dirty electricity from Smart Meters."* (emphasis added)

- **Witness Statement, Andrew Goldsworthy, Lecturer in Biology (retired), Imperial College, London** "Many people suffer one or more of a wide variety of symptoms when exposed to weak non-ionizing electromagnetic radiation, including that from cell phones and Wi-Fi. Those responsible for the radiation deny that these effects exist, saying that there is no plausible explanation. In this submission I explain just how these effects can arise, and how virtually all of them share one of two common mechanisms."

12

- **Professor Lukas H. Margaritis – January 2011, National and Kapodistrian, University of Athens – Faculty of Biology, Department of Cell Biology & Biophysics, Electromagnetic Biology Laboratory;** "The argument that "more and more wireless devices will be used in daily life" is not and cannot be taken as obligatory. Who can support that the constitution, any constitution of any country should allow installations to take place (as the one with Smart Meters) against the rights for health of the citizens."

- **Overloading of Towns and Cities with Radio Transmitters: A hazard for the human health and disturbance of eco-ethics. Karl Hecht, Elena N. Savoley, IRCHET International Research Center of Healthy and Ecological Technology, Berlin, Germany** Essential Findings after Long-Term EMF EF Effect Objectively gathered findings: neurasthenia, neurotic symptoms, EEG changes (decay of the alpha rhythm into the theta rhythm and isolated delta rhythm), sleep disorders, deformation of the biologic rhythm hierarchy, disorder in the hypothalamohypophyseal adrenal cortex system, arterial hypotonia, more rarely arterial hypertonia, bradycardia, or tachycardia, vagotonic displacement of the cardiovascular system, increased susceptibility to infection, hyperfunction of the thyroid, potency disorders.

  System Subjective Complaints: exhaustion, lack of energy, daytime tiredness, quick tiring under stress, constriction of physical and mental ability, concentration and memory decline, cardiac pain, heart racing, weakness of concentration, headaches, lightheadedness.

  Animals and Plants are Also in Danger

  "Animals and plants are also very negatively influenced by this high-frequency electromagnetic radiation. In the case of cows, reduction of the milk yield and malformed offspring have been proven. Graver for humankind could be the death of bees observed everywhere due to the electro-smog contaminated environment. When the bees are dead, people not only have no more honey, but also no more fruit, because pollination of the flowers is impossible without bees. Humankind stands today before an important decision."

- **Comments on California Council on Science and Technology's Smart Meter Report, January 2011, Nancy Evans, Health Science Consultant, San Francisco. United States District Court – District of Oregon – Portland Division – June 2011** "This report ignores a fundamental public health principle: prevention of harm through a precautionary approach, based on evidence of harm rather than absolute proof of harm. CCST dismissed the substantial body of evidence indicating that *non-thermal* effects of radiofrequency radiation (RF) are real and include cancer as well as neurological effects. *There are no federal standards for RF exposure based on long-term, chronic exposure or on non-thermal effects*, precisely the type of exposure from smart meters and the most likely to cause human health effects. This report also fails to consider the total exposure to RF, which has increased exponentially because of cell phone antennas and broadcast towers. Wi-Fi networks blanket entire neighborhoods and cities as well as homes,

13

schools, cafes and stadiums. Smart meters add one more layer of involuntary chronic exposure to RF.

"It is misleading to compare smart meters to cell phones and other wireless devices that are used voluntarily and that some people choose not to use because of the potential health effects. *Mandating wireless smart meters in homes is radiation without representation: an infringement of personal and property rights.*"

- **Sworn Declaration of Dr. David O. Carpenter, M.D., Director, Institute for Health and the Environment, University at Albany and Professor of Environmental Health Sciences within the School of Public Health. Formerly Dean of the School of Public Health at the University of Albany and Director of the Wadsworth Center for Laboratories and Research of the New York State Department of Health. United States District Court – District of Oregon – Portland Division – June 2011** "Exposure to EMF has been linked to a variety of adverse health outcomes. The health endpoints that have been reported to be associated with ELF and/or RF include childhood leukemia, adult brain tumors, childhood brain tumors, genotoxic effects (DNA damage and micronucleation), neurological effects and neurodegenerative disease (like ALS and Alzheimer's), immune system disregulation, allergic and inflammatory responses, breast cancer in men and women, miscarriage and some cardiovascular effects. The strongest evidence for adverse health effects of EMFs comes from associations observed in human populations with two forms of cancer: childhood leukemia and chronic lymphocytic leukemia in occupationally exposed adults.

"There is suggestive to strongly suggestive evidence that RF exposures may cause changes in cell membrane function, cell communication, metabolism, activation of protooncogenes, and can trigger the production of stress proteins at exposure levels below current regulatory limits. Resulting effects can include DNA breaks and chromosome aberrations, cell death including death of brain neurons, increased free radical production, activation of the endogenous opioid system, cell stress and premature aging, changes in brain function including memory loss, retarded learning, performance impairment in children, headaches and fatigue, sleep disorders, neurodegenerative conditions, changes in immune function (allergic and inflammatory responses), reduction in melatonin secretion and cancers."

- **Amended Declaration of Dr. David O. Carpenter, M.D., Director, Institute for Health and the Environment, University at Albany. Declaration in support of an injunction against Portland Public Schools use of Wi-Fi.** "The media-promulgated notion that the relevant scientific studies are inconsistent and inconclusive is false and misleading. Chronic exposure to PM MW radiation harms every individual in a population in some ways, even if these are not always detectable by the individual or consciously attributed to the responsible RF/MW radiation sources. This Agent injures some individuals into a condition in which symptoms will be more easily retriggered with subsequent exposure. And for a priori susceptible individuals and those using electronic medical devices, it can respectively exacerbate the extant medical conditions and disrupt medical device operation, even to the point of death. Bassen 1997 discusses the hundreds

14

of excess deaths, even at that time, from wireless communications radiation. See also Radiofrequency Interference with Medical Devices, IEEE Engineering in Medicine and Biology Magazine."

- **Same lawsuit; Portland Public Schools. Sworn Declaration of Dr. Magda Havas, B. Sc., Ph.D.; Addendum A** Dr. Havas' sworn declaration covers dozens of studies regarding EMF and how it affects the human body: Neurological/Sleep/Learning/Behavior/Eltrohypersenitivty. Stress-Response/Hormonal response/Blood-Brain-Barrier/Immune System. Cardiac and reproduction as well as cancer.

- **Same Lawsuit; Portland Public Schools; Sworn Declaration of Dr. Magda Havas, B. Sc., Ph.D.; Addendum D** "We don't know all the reasons why pulsed radiation is more harmful than non-pulsed radiation. The intensity of radio frequency radiation can be measured using power density. Guidelines in various countries differ 5-orders of magnitude or by a 100,000 units. This is unheard of for chemical toxicants and for ionizing radiation where standards globally are quite similar. The worst guidelines are in the UK but Canada and the U.S. are not far behind."

- **Same Lawsuit; Portland Public Schools; Sworn Declaration of Lloyd Morgan in support of an injunction against Portland Public Schools use of Wi-Fi.** Morgan testifies about his knowledge of electromagnetic fields (EMFs) and radiofrequency/microwave (RF/MW) radiation in the context of health effects across frequencies from 1 Hz to 300 GHz. WI-FI deploys microwave radiation at a carrier frequency of 2.45 GHz, the same frequency as a microwave oven as well as the effects of radio frequency radiation exposure to animals.

- **Same Lawsuit; Portland Public Schools; Sworn Amended Declaration of Curtis Bennett, an expert witness for Canadian Parliament on the dangers of Wi-Fi and Smart Meter Frequencies.** "Governments and taxpayers are funding health costs, wireless technologies are contradicting those objectives."

- **Addendum – Assessment of Radiofrequency Microwave Radiation Emmission from Silver Springs OWS-NIC514 – Model Wireless Electric Meter – February 18, 2001 Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters – January 1, 2011** "Consumers may also have already increased their exposures to radiofrequency radiation in the home through the voluntary use of wireless devices (cell and cordless phones), PDAs like BlackBerry and iPhones, wireless routers for wireless internet access, wireless home security systems, wireless baby surveillance (baby monitors), and other emerging wireless applications. Neither the FCC, the CPUC, the utility nor the consumer know what portion of the allowable public safety limit is already being used up or pre-empted by RF from other sources already present in the particular location a smart meter may be installed and operated.

"Consumers, for whatever personal reason, choice or necessity who have already eliminated all possible wireless exposures from their property and lives, may now face

15

excessively high RF exposures in their homes from smart meters on a 24-hour basis. People who are afforded special protection under the federal Americans with Disabilities Act are not sufficiently acknowledged nor protected. People who have medical and/or metal implants or other conditions rendering them vulnerable to health risks at lower levels than FCC RF limits may be particularly at risk (Tables 30-31). This is also likely to hold true for other subgroups, like children and people who are ill or taking medications, or are elderly, for they have different reactions to pulsed RF. Childrens' tissues absorb RF differently and can absorb more RF than adults (Christ et al, 2010; Wiart et al, 2008).

"Safety standards for peak exposure limits to radiofrequency have not been developed to take into account the particular sensitivity of the eyes, testes and other ball shaped organs. There are no peak power limits defined for the eyes and testes, and it is not unreasonable to imagine situations where either of these organs comes into close contact with smart meters and/or collector meters, particularly where they are installed in multiples (on walls of multi-family dwellings that are accessible as common areas). In summary, no positive assertion of safety can be made by the FCC, nor relied upon by the CPUC, with respect to pulsed RF when exposures are chronic and occur in the general population. Indiscriminate exposure to environmentally ubiquitous pulsed RF from the rollout of millions of new RF sources (smart meters) will mean far greater general population exposures, and potential health consequences."

Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters – January 1, 2011

"Scientists who study radiofrequency radiation from wireless technologies have issued a scientific statement warning that exposures may be harming the development of children at levels now commonly found in the environment. Pregnant women are cautioned to avoid using wireless devices themselves and distance themselves from other users.

"The Seletun Scientific Statement has now been published in Reviews on Environmental Health (2010; 25: 307-317). The article recommends that lower limits be established for electromagnetic fields and wireless exposures, based on scientific studies reporting health impacts at much lower exposure levels. Many researchers now believe the existing safety limits are inadequate to protect public health because they do not consider prolonged exposure to lower emission levels that are now widespread."

- **High-Frequency – Meters (EMF) Comparison I (05-2010) and Biological Effects and Health Implications of Microwave Radiation** "The clear consensus of the BioIntiative Working Group members is that the existing public safety limits are inadequate for both ELF and RF." - The BioIntiative Report

"It appears it is the information conveyed by electromagnetic radiation (rather then the heat) that causes biological changes – some of these biological changes may lead to loss of well-being, disease and even death. - The BioIntiative Report

16

"Both ELF and RF can be considered genotoxic (will damage DNA) ...... including exposure levels that are lower than existing safety limits." - The BioIntiative Report

## OTHER STATES ACTIONS

29. Most states are in the same posture as is Texas in that the implementation of the AMI has been undertaken on the faith of encouragement of others but without a thorough examination of its cost effectiveness, harm and risks of harm, nor of the accuracy of the smart meters, but in those states that have made an objective assessment of the miniscule benefits of AMI's implementation in comparison to the significant expense of their implementation, the result has been to either proceed with caution, providing some protection for the rights of consumers to opt out on the attachment of the smart meters to their homes and workplaces or to prohibit implementation of the AMI program in its entirety.

30. In the cases of Maine, Maryland, New Jersey and Hawaii the utility regulatory authorities in those states have after due consideration determined to prohibit the installation of smart meters and implementation of the AMI. Other states, such as Connecticut, are seriously considering following suit.

## RULEMAKING SOUGHT BY THIS PETITION

31. Petitioners seek both emergency and ordinary rule making by this body as indicated by the following:

**A. EMERGENCY RULE: Moratorium on continued installation of harmful RF and EMF radiation emitting devices until further study and evaluation permits adoption of rules governing the same**

32. Texas Administrative Code, Title 16, Part II, § 22.283, authorizes the PUC to adopt emergency rules, without hearing and without prior publication and comment "if the

17

commission finds that an imminent peril to the public health, safety, or welfare . . .requires adoption of a rule on fewer than 30-days notice and states in writing its reasons for that finding."

33.     Petitioners submit that there is ample cause for concern that the installation of smart meters and implementation of the AMI presents an imminent peril to the public health, safety and welfare and that each day that installation of smart meters continues adds more and more emissions of RF and EMF radiation to the general living and working environment of Texans.

34.     In addition, since the current means of installation are through misconduct, none of the installations to date nor any installations occurring in the present are being made with genuine, informed consent or acquiescence, all of such consents or acquiescence being induced through fraud, duress and/or force.

35.     The only way to prevent continued and constantly increasing irreparable harm to the public while a thorough examination of expense, risks and benefits and formulation of appropriate rules providing for consumer rejection of the voluntary smart meters, for disclosure of important information and risks to both those upon whom smart meters and their emissions have been fraudulently or forcefully imposed and those to whom installation is proposed and for the protection of not only the general public, but, in particular, those young, elderly, infirm and medically sensitive persons, is to issue an immediate moratorium on the continued installation of smart meters.

36.     Accordingly, petitioners urgently request that the PUC exercise its emergency rulemaking authority to prohibit any further installations of any RF or EMF emitting devices, whether smart meters, antennae, repeaters, nodes or other related equipment, until the PUC can

18

conduct hearings and studies of the risks and injuries caused by such equipment and to formulate and publish rules ensuring the public health, safety and welfare is protected.

37.     Petitioners also seek ordinary rulemaking by this body consisting of:

**B. ORDINARY RULEMAKING AUTHORITY:  The permanent prohibition and mandated removal of smart meters and other RF and EMF radiation emitting devices; Or, alternatively**, and only if after thorough consideration of risks and benefits the PUC determines that there is a way to implement the AMI and its smart meters and related equipment while protecting the public health, safety and welfare and preserving consumers' rights to be fully and truthfully informed and to decline participation in the program, **formulation and adoption of rules providing for the safe implementation of smart meters and related equipment while preserving the public health, safety and welfare and the rights of consumers to be fully and truthfully informed and to decline participation in the program as well as to protect those members of the public at increased risk of injury or death from radiation emitted by neighboring services.**  Accordingly, the adoption of the following rules is proposed:

PROPOSED NEW RULES

(Numbers to be assigned by PUC)

First Proposed Rule:

The installation of advanced metering systems shall be voluntary on the part of the consumer and every consumer shall have the right to refuse to participate in the AMI program without being penalized for preserving the safety of himself, his family, invitees, licensees, employees, customers, clients and/or tenants.

19

Second Proposed Rule:

Any utilities, meter purveyors, installers, or any other person, firm or corporation engaging in the deployment and/or installation of such RF and/or EMF emitting devices must prior to any installation notify the consumer in writing that:

1. The installation and operation of such device or devices is totally voluntary on the consumer's part;

2. The proposed advanced metering device emits RF and/or EMF radiation at levels known to have caused health risks and illness including, but not by way of limitation, heart irregularities, headaches, insomnia, hypertension, thyroidal dysfunction, dizziness and nausea and that children, elderly persons and persons in poor health are more likely to suffer such side effects;

3. That RF and/or EMF emissions have been known to cause life supporting medical devices such as pacemakers and insulin injectors to malfunction and that long-term exposure to RF and/or EMF radiation is suspected of being a cause of cancer and DNA disruption;

4. That the installation of such meters will not result in any savings of energy or reduction in the consumer's electric bill;

and, only after providing such disclosures in writing, obtain the written consent of the consumer to the proposed installation.

Third Proposed Rule:

Every household and business where a RF and/or EMF emitting meter has been installed prior to adoption of these rules must be notified in writing of the foregoing (Second Rule, disclosures 1-4) which notice shall include an offer to remove the device and replace it with an analog meter without any expense to the consumer and shall provide a reasonable and convenient means of notifying the utility of the consumer's election to have the device so replaced.

Fourth Proposed Rule:

Any business or other facility open to the public with a RF and/or EMF emitting meter installed on, at or in its premises shall post a conspicuous notice at or near all entrances used by the public that RF and/or EMF emitting devices are in use and that such equipment is known to interfere with the proper functioning of medical devices such as pacemakers, insulin and other auto-injectors, internal auto-defibrillators, portable heart monitors and similar devices.

Fifth Proposed Rule:

The installation of any RF and/or EMF emitting meters within two hundred (200) feet of any residence occupied by or business employing any person who relies on a pacemaker, insulin or other auto-injector, pain management auto-injector, internal auto-defibrillator, portable heart monitor, or similar medical device once the utility has been placed on notice of such.

Sixth Proposed Rule:

The installation of any RF and/or EMF emitting meters shall maintain separation from other RF and/or EMF emitting meter in order to remain within limitations of cumulative radiations consistent with FCC rules and regulations concerning "ganging" of such devices.

## DEMAND FOR (MANDATORY) PUBLIC HEARING

38. Texas Administrative Code, Title 16, Part II, § 22.282 provides that a public hearing must be held by the PUC where twenty-five or more petitioners request a public hearing. The number of petitioners in this proceeding by far exceed twenty-five (25) and petitioners hereby demand a mandatory public hearing at which petitioners can present evidence and testimony concerning the deleterious effects of the AMI's smart meters, their efficacy, or lack

21

thereof, the absence of any conservational effect or increase in efficiency of electric service consumption or distribution, and the need to ban or closely regulate the use of the same.

## DESIGNATION OF LEAD PETITIONER AND ATTORNEY IN FACT

39. The undersigned petitioners hereby designate Devvy Kidd as the lead petitioner and authorize her to act and speak as their collective voice.

40. The undersigned petitioners also name, nominate, constitute and appoint

Tommy K. Cryer, Esq.
7330 Fern Ave., Suite 1102
Shreveport, LA 71105

their mandatary, attorney in fact and agent for the purposes of these proceedings with full and plenary authority to act on their behalf, including, but not by way of limitation, to receive and acknowledge receipt of notices proper to be made by mail, to enter into stipulations of fact, to execute and file on our behalf any subsequent filings in connection with this petition and its proceedings, to stand in our stead before the Commission in any and all proceedings held in this cause, to call and present witnesses and produce and introduce evidence, whether documentary or testimonial, on our behalf, to make objections to the introduction of the same by opposing interests and to present arguments in support of this petition or any other act deemed by the attorney in fact to be in the best interest of its effective prosecution.

WHEREFORE, petitioners pray for the immediate initiation of rulemaking procedures as described hereinabove.

Petitioners further pray that due to the genuine risk of irreparable injury to the public as amply shown by this petition and the exhibits attached hereto; and that the continued employment by utilities and purveyors of unlawful fraud, duress in order to continue with the

22

installation of additional RF and EMF emitting devices on homes and businesses, thereby increasing not only the irreparable harm and risk of harm to the public, but also exacerbating the expense and effort required to remove previously installed meters should the PUC determine, as have equivalent authorities in many other states, to prohibit their deployment in the State of Texas, that the PUC exercise its emergency rulemaking authority and issue an order immediately prohibiting the installation of any so-called "smart" meters during the pendency of this process and until further order of the PUC.

Petitioners further pray that a hearing be held as required by Administrative Code, Title 16, Part II, § 22.282 during which petitioners will be afforded an opportunity to present evidence and arguments in support of this petition and that after hearing the PUC promulgate and adopt a substantive rule prohibiting the continued installation of smart meters and ordering the removal of all such meters previously installed.

AND NOW, IN THE ALTERNATIVE, and only in the event that the PUC shall find that the RF and/or EMF emitting meters can be installed and deployed in a manner and under conditions that will guarantee and preserve the safety, health and wellbeing of the public, then, in that event, petitioners pray that any such rules regarding such deployment include and provide for, but not by way of limitation, the following:

A. Recognize the right of every consumer to refuse to participate in the AMI program without being penalized for preserving the safety of himself, his family, invitees, licensees, employees, customers, clients and/or tenants;

B. Require that any utilities, meter purveyors, installers, or any other person, firm or corporation engaging in the deployment and/or installation of such RF and/or EMF emitting devices must prior to any installation notify the consumer in writing that:

23

5. The installation and operation of such device or devices is totally voluntary on the consumer's part;

6. The proposed advanced metering device emits RF and/or EMF radiation at levels known to have caused health risks and illness including, but not by way of limitation, heart irregularities, headaches, insomnia, hypertension, thyroidal dysfunction, dizziness and nausea and that children, elderly persons and persons in poor health are more likely to suffer such side effects;

7. That RF and/or EMF emissions have been known to cause life supporting medical devices such as pacemakers and insulin injectors to malfunction and that long-term exposure to RF and/or EMF radiation is suspected of being a cause of cancer and DNA disruption;

8. That the installation of such meters will not result in any savings of energy or reduction in the consumer's electric bill;

and, only after providing such disclosures in writing, obtain the written consent of the consumer to the proposed installation.

C. Requiring that every household and business where a RF and/or EMF emitting meter has been installed be notified in writing of the foregoing (items B(1)-(4)) which notice shall include an offer to remove the device and replace it with an analog meter without any expense to the consumer and shall provide a means of notifying the utility of the consumer's election to have the device so replaced;

D. Requiring any business or other facility open to the public with a RF and/or EMF emitting meter installed on, at or in its premises to post a conspicuous notice at or near all entrances used by the public that RF and/or EMF emitting devices are in use and that such equipment is known to interfere with the proper functioning of medical devices such as pacemakers, insulin and other auto-injectors, internal auto-defibrillators, portable heart monitors and similar devices;

E. Prohibiting the installation of any RF and/or EMF emitting meters within a particular distance to be determined by the PUC from any residence occupied by or business

24

employing any person who relies on a pacemaker, insulin or other auto-injector, pain management auto-injector, internal auto-defibrillator, portable heart monitor, or similar medical device once the utility has been placed on notice of such;

F. Prohibiting the installation of any RF and/or EMF emitting meters within a particular distance from another RF and/or EMF emitting meter in order to remain within limitations of cumulative radiations consistent with FCC rules and regulations concerning "ganging" of such devices; and

G. Any other rules or regulations the PUC should determine to be necessary and proper in order to ensure the health, safety and wellbeing of the public.

Also in the same alternative, petitioners further pray that a hearing be held as required by Administrative Code, Title 16, Part II, § 22.282 during which petitioners will be afforded an opportunity to present evidence and arguments in support of this petition and that after hearing the PUC promulgate and adopt a substantive rules governing the rights of consumers to refuse installation of such devices and requiring full disclosure of the risks and perils presented by the exposure to RF and EMF emissions as set forth hereinabove.

Respectfully submitted,

Devvy Kidd
P. O. Box 1102
Big Spring, TX  79721

Devvy Kidd
for:
John Kidd
P. O. Box 1102
Big Spring, TX  79721

25

Tommy K. Cryer, Esq. La. Bar 4634
7330 Fern Ave., Suite 1102
Shreveport, LA 71105
318 797-8949
318 797-8951 (fax)
CryerLaw@aol.com
     Petitioners' Representative and
     Attorney in Fact

# APPENDIX C

| PETITION FOR INITIATION OF | § | PUBLIC UTILITY COMMISSION |
| RULEMAKING PROCEEDINGS | § | |
| REGARDING SMART METERS | § | OF TEXAS |

## ORDER DENYING PETITION FOR RULEMAKING

On May 17, 2012, Devvy Kidd, John Kidd, and 193 other signatories (Petitioners) filed a Petition for Initiation of Rulemaking Proceedings with the Public Utility Commission of Texas (Commission).  Petitioners request that the Commission initiate and conduct rulemaking procedures, both emergency and ordinary, relating to the deployment of smart meters by electrical utilities and others as part of their Advanced Metering System (AMS) program.

Petitioners seek an emergency rule that would place a moratorium on continued installation of smart meters until further study and evaluation permits adoption of rules governing smart meters. In addition, Petitioners seek ordinary rulemaking to mandate the permanent prohibition and removal of smart meters and other devices that emit radio frequencies (RF) or electromagnetic fields (EMF).  Pleading in the alternative, Petitioners request that the Commission formulate and adopt rules to provide for safe implementation of smart meters, to allow customers to decline participation in the AMS program, and to protect those members of the public at increased risk of injury or death from radiation emitted by neighboring services.

Petitioners further request a public hearing at which Petitioners can present evidence and testimony concerning the effects of the smart meters and the need to ban or closely regulate the use of them.

Additionally, Petitioners include proposed rule language for six rules related to smart meter deployment. The six proposed rules would (1) allow customers to opt-out of receiving smart meters, (2) require certain notices to be posted and disclosures to be made regarding smart meters' effects on health, and (3) limit the number of smart meters installed in a given area so as to reduce RF or EMF congestion.

The petition is subject to TEX. GOV'T CODE §2001.021 and P.U.C. PROC. R. 22.281. The Commission published notice of this petition in the June 1, 2012 issue of the *Texas Register* (37 TexReg 4102) with a comment deadline of June 22, 2012.

One hundred and twenty three comments were filed in this project through June 27, 2012. Most comments were filed in support of the petition. Supporting comments expressed one or more concerns regarding smart meter deployment. The concerns expressed may be organized by subject into eight categories as listed below.

First, commenters expressed concern about potential negative health effects from exposure to RF or EMF radiation emitted by smart meters. Certain commenters claimed that they experienced one or more of the following symptoms as a result of a smart meter: insomnia, fatigue, anxiety, tinnitus, headaches, dizziness, nausea, nose bleeds, seizures, elevated heart rate, heart arrhythmias, inability to focus, drainage from the eyes, tingling in the arms, shoulder pain, neck aches, blurred vision, night sweats, joint pain, and aches in knees, legs, and ankles. Many commenters cited to a World Health Organization report that purportedly states that sustained exposure to RF or EMF radiation may cause headaches, insomnia, fatigue, skin rashes, heart

arrhythmias, immune system defects, memory loss, infertility, and cancer. Finally, commenters claimed that prior health studies conducted on this topic (1) are outdated, (2) do not consider cumulative effects of multiple RF or EMF radiating devices, and (3) do not consider the effects of RF or EMF radiation on young children or people who may have implanted electrical medical devices such as pacemakers and defibrillators.

Second, commenters expressed concern over the privacy of their electric use information. Most commenters were unsure of who would be allowed access to this information. Commenters generally stated that they did not want their information sold to marketing or affiliated companies. Additionally, commenters were concerned that the information would allow the electric utility to know whether a building was occupied as well as what electrical devices were being used within a building.

Third, commenters expressed concern regarding the security of their electric use information. Commenters claimed that their electric use information is at risk of being intercepted by unauthorized third parties who may use the information for unlawful purposes. A frequently mentioned example of an unlawful purpose is a burglar who uses the information to know when a resident is away from a house. Moreover, commenters claimed that the increasing popularity of smart meters will make it easier for foreign organizations to exploit vulnerabilities in the electrical grid and thereby threaten grid reliability.

Fourth, commenters expressed concern over their freedom to use electricity in a manner of their choosing. Certain commenters claimed that an electric utility might remotely change a resident's

thermostat during times of peak demand to reduce the level of air conditioning in the summer or to reduce the heat in the winter. Commenters also claimed that a smart meter may be used by an electric utility in the future to interfere with a customer's ability to use electricity as the customer desires.

Fifth, commenters claimed that the inaccuracy of a newly installed smart meter resulted in a substantial increase in their electric utility bill. Commenters offered their own experience of higher than usual electric billing or cited news reports of specific instances of higher than usual electric bills.

Sixth, commenters stated concern that smart meters may cause damage to their property. Most commenters who expressed this concern claimed that smart meters caused electrical surges that caused appliances to fail. Additionally, commenters cited news reports of house fires that that they claim may have been caused by smart meters.

Seventh, commenters stated concern that smart meters would make it possible for an electric utility to use dynamic time-of-use pricing in the residential market. The commenters believe that such a pricing system would increase the cost of electric service, particularly for customers who are homebound.

Eighth, commenters were concerned that the smart meters' automation of reading and transmitting electric use information would result in a reduction of jobs for meter-reading

000000004

employees and would have a negative effect on the meter-reading employees, their families, and the U.S. economy.

Four parties filed comments opposing the petition: AEP Texas Central Company and AEP Texas North Company (together, AEP Texas); CenterPoint Energy Houston Electric, LLC (CenterPoint); Oncor Electric Utility Company, LLC (Oncor); and Texas-New Mexico Power Company (TNMP) (collectively, Electric Utilities).

The Electric Utilities noted that the petition filed in this proceeding is nearly identical to the petition filed in Project No. 40199. The Electric Utilities therefore incorporated by reference or restated their comments filed in Project No. 40199. Additionally, the Electric Utilities stated that the Commission denied the petition filed in Project No. 40199 because the Commission was already considering similar issued in Project No. 40190. The Electric Utilities concluded that the Commission should similarly deny this petition because the Commission previously determined that Project No. 40190 would be a more efficient and effective forum in which to address concerns raised by Petitioners.

In addition to the Electric Utilities' comments summarized above, Oncor discussed each of the six proposed rules contained in the petition. Generally, Oncor argued that the proposed rules are contrary to the Public Utility Regulatory Act and outside of the Commission's authority.

After considering the petition and comments received, the Commission denies the Petition for Initiation of Rulemaking Proceedings, because the Commission has another project to address

000000005

Petitioners' concerns about smart meters, Project No. 40190, *PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-Out Program.* In that project, the Commission has received extensive comments that raise concerns like those in the petition in this project. It will be more efficient and effective for the Commission to consider smart meter concerns in one project. As to the request for an emergency rule, the Commission denies that request for the additional reason that no emergency exists as to the issues raised in the petition. Therefore, consistent with Commission practice, the Commission denies the petition in this project, which will allow it to focus its consideration of concerns about smart meters to Project No. 40190.

**SIGNED AT AUSTIN, TEXAS on the** 13th **day of JULY 2012.**

**PUBLIC UTILITY COMMISSION OF TEXAS**

**DONNA L. NELSON, CHAIRMAN**

**KENNETH W. ANDERSON, JR., COMMISSIONER**

**ROLANDO PABLOS, COMMISSIONER**

Q \CADM\TXR-Rules Management\Rules - petitions\40404\40404FO docx